UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

DENISE L. LEAVINGS,

          Plaintiff,

v.                                       Case No.  5:07-cv-513-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

          Defendant.

_____

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for a period of disability, disability insurance benefits, and supplemental security income. (Doc. 1.) The Commissioner has answered (Doc. 11), and both parties have filed briefs outlining their respective positions. (Docs. 16 & 18.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

On November 30, 2004, Plaintiff filed applications for a period of disability, disability insurance benefits, and supplemental security income, alleging a disability onset date of March 20, 2004. (R. 56-61, 325-26.) Plaintiff's application was denied initially and upon reconsideration. (R. 20-23, 38-39, 43-44, 316-24.) Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 37.) The ALJ conducted Plaintiff's administrative hearing on April 12, 2007. (R. 334-47.) The ALJ

issued a decision unfavorable to Plaintiff on July 25, 2007. (R. 9-19.) Plaintiff's request for review of the hearing decision by the Social Security Administration's Office of Hearings and Appeals was denied. (R. 5-8.) Plaintiff then appealed to this Court. (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla in that the evidence must do more than merely "create a suspicion of the existence of [a] fact," and must include "such relevant evidence as a reasonable person would accept as adequate to support the conclusion."[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[1] *See* 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[5]   The law

defines disability as the inability to do any substantial gainful activity by reason of any

medically determinable physical or mental impairment that can be expected to result in

death, or has lasted or can be expected to last for a continuous period of not less than

twelve months.[6] The impairment must be severe, making Plaintiff unable to do her

previous work, or any other substantial gainful activity which exists in the national

economy.[7]

　　　The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a

claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a

claimant does not have any impairment or combination of impairments which

significantly limit her physical or mental ability to do basic work activities, then she does

not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments

meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the

Code of Federal Regulations, she is disabled.[11] Fourth, if a claimant's impairments do

---

[5] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *See* Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] Id. § 404.1520(c).

[11] Id. § 404.1520(d).

not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] Id. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2.
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.
Id. (internal citations omitted).

[16] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker v. Bowen, 826 F.2d 996,
(continued...)

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as the ALJ introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

### III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was thirty four (34) years old at the time of the ALJ's decision on July 25, 2007. (R. 9-19, 56, 336.) She graduated from high school and has two years of college education. (R. 337.) Plaintiff has previous work experience as an office manager and as a case manager for the Department of Labor. (R. 341-42.) Plaintiff contends that she has been unable to work since March 20, 2004 due to fibromyalgia, arthritis, muscle problems, and pain in her back and neck. (R. 22-23, 56, 323-24.) Plaintiff is insured for benefits through December 31, 2009. (R. 47.)

---

[17](...continued)
1003 (11th Cir. 1987) ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] See id.

[21] See Doughty v. Apfel, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

**A.    *Medical Evidence***

**Back, Neck and Shoulder Pain**

Plaintiff's complaints of back, neck, and shoulder pain began after her involvement in an automobile accident which occurred on March 20, 2004. (R. 83, 99.) Immediately following the accident, Plaintiff reported to the emergency room at Munroe Regional Medical Center with complaints of moderate pain in her neck, chest and lower back. (R. 131-44.) X-rays of Plaintiff's chest, and cervical and lumbar spine were normal. (R. 139.) Plaintiff was diagnosed with cervical and lumbar sprain and discharged with instructions to follow up with her primary care physician. (R. 144.)

In March 2004, Plaintiff reported to Dr. Glen A. Morgan, her primary care physician, with complaints of pain throughout her neck, back and shoulders which had worsened since the motor vehicle accident three days prior. Dr. Morgan prescribed pain medication and sent Plaintiff for diagnostic imaging of her whole spine. X-rays of Plaintiff's thoracic spine were normal. (R. 127.) An MRI of her thoracic spine revealed mild mid-thoracic degenerative spondylosis but no acute abnormality. (R. 129.) MRIs of Plaintiff's cervical and lumbar spine were unremarkable. (R. 126, 128.)

In April 2004, Plaintiff returned to Dr. Morgan's office for follow up with complaints of constant generalized pain throughout her neck, back and shoulders which had not gotten any better since onset in March 2004. The progress notes from Dr. Morgan's office disclose Plaintiff's unremarkable MRI results. Upon physical examination, by Steve Chapman, a certified physician's assistant with Dr. Morgan's office, the examiner observed diffuse tenderness in Plaintiff's entire spine bilaterally and

a restricted range of motion in Plaintiff's neck and back. The examiner noted that Plaintiff was "adamant about being seen by a specialist." Dr. Morgan diagnosed Plaintiff with cervical and low back pain status post motor vehicle accident and referred her to an orthopedist for evaluation. (R. 98.)

In May 2004, Plaintiff returned to Dr. Morgan with complaints of slightly improved symptoms since her previous office visit. The examination of Plaintiff revealed hypersensitivity to palpation of Plaintiff's entire spine with minimal muscle spasms. As noted by Mr. Chapman in his progress note, "just about anywhere [he] touched she said was exquisitely painful." (R. 96.)

From June 2004 to January 2005, Plaintiff was treated by Dr. Prathima Reddy for chronic pain in her neck, low back, hips and left shoulder. (R. 145-57.)  Dr. Reddy noted Plaintiff's complaints of significant but diffuse pain in her neck and throughout her spine, left shoulder and left hip. Dr. Reddy also noted that Plaintiff's complaint of numbness in her left leg "is not specific to any nerve or dermatomal distribution." (R. 155.) Physical examinations revealed no swelling or deformity in Plaintiff's joints.  Plaintiff's cranial nerves, motor strength, sensation, and reflexes were intact. (R. 145, 153, 156.) Straight leg raise testing was negative bilaterally. (R. 153, 156.) Dr. Reddy consistently observed "exaggerated pain responses to even light palpation" and positive non-organic signs.[22] After Plaintiff's initial visit in June 2004, Dr. Reddy diagnosed Plaintiff with myofascial pain syndrome, left shoulder impingement, and left hip bursitis, prescribed pain

---

[22] (R. 145, 153, 156.) "Signs of organic problems are findings from the physical examination that indicate the presence of pathology or disease." David A. Scalzitti, *Screening for Psychological Factors in Patients with Low Back Problems: Waddell's Nonorganic Signs*, 77 PHYS. THER. 306, 306 (1997). By contrast, non-organic signs suggest that the relevant symptoms may have a psychological component. Id.

medication and referred Plaintiff for a "very active course of physical therapy." (R. 156-57.) During a follow up visit later that month, Dr. Reddy opined that "there is a gross psychological component to [Plaintiff's] pain." Plaintiff's unremarkable diagnostic test results and continued complaints of pain prompted Dr. Reddy to send Plaintiff for a whole body bone scan and refer her to another orthopedist for a second evaluation. Dr. Reddy noted that she was "at a loss to find any objective findings to support the level of pain that [Plaintiff] is having subjectively." (R. 154.) In a progress note dated November 15, 2004, Dr. Reddy noted that Plaintiff had been evaluated by Dr. Rubin, a neurologist, who "also did not find any objective findings for the level of pain that [Plaintiff] is having." (R. 152.) In an attempt to treat Plaintiff's complaints of chronic pain, Dr. Reddy referred Plaintiff to a chiropractor and psychotherapist for treatment of her symptoms. (R. 152, 154.) In January 2005, Dr. Reddy's neurological examination of Plaintiff revealed "sensation was within normal limits, although [Plaintiff] states differences that are non-dermatomal and non-peripheral nerve distributions." (R. 145.)

In a letter dated December 14, 2004, from Dr. Reddy to Plaintiff's attorney, Dr. Reddy opined that Plaintiff had reached "maximum medical improvement" and assessed that she had an overall permanent impairment of 2%. Dr. Reddy noted that diagnostic and clinical findings "do not indicate any nerve or muscle injury, but rather soft tissue injury as a result of a strain from the auto accident." (R. 147.)

Over the course of Plaintiff's treatment since the accident, there is very little objective medical evidence to support the severity of Plaintiff's complaints of pain. Both diagnostic testing and clinical findings have been largely benign. As noted above,

diagnostic imaging of Plaintiff's spine performed shortly after the motor vehicle accident was unremarkable. In June 2004, an MRI of Plaintiff's left shoulder revealed mild subacromial external impingement with mild tendinopathy and peritendinitis of the supraspinatus but no evidence of a tear. (R. 124-25.) X-rays of the pelvis, left hip, and left shoulder were taken in June 2004 during Plaintiff's initial office visit with Dr. Reddy and the results were unremarkable. (R. 156.) In July 2004, Plaintiff underwent a whole body bone scan which was unremarkable. (R. 123.) In November 2004, EMG and nerve conduction studies of her upper extremities and cervical paraspinal muscles were normal. (R. 149.) X-rays of her cervical, thoracic and lumbosacral spine taken in October 2005 revealed no bony abnormalities. (R. 213.) In September 2006, an MRI of Plaintiff's cervical spine revealed mild degenerative changes. (R. 256.) An MRI of her lumbosacral spine was normal. (R. 257.)

With respect to clinical findings, physical examinations typically revealed diffuse and non-focal tenderness without swelling or deformity in any of her joints; normal reflexes and sensation; slow, but otherwise unremarkable gait; and intact motor strength in her upper and lower extremities. (R. 90, 97-99, 145, 153, 156, 197, 204, 206, 225-27, 260, 273.) Straight leg raise testing was negative. (R. 90, 153, 156, 227.) Examining physicians observed hypersensitivity and exaggerated pain responses upon palpation of her spine. (R. 96, 145, 153, 156, 165, 206.) Further, Plaintiff frequently deferred or actively restricted range of motion testing due to her complaints of pain. (R. 95, 97-98, 145, 153, 226-27.)

Dr. Eric Puestow, a non-examining state agency physician, reviewed Plaintiff's medical records in April 2005 and prepared a Physical Residual Functional Capacity Assessment. Dr. Puestow opined that Plaintiff could frequently lift and/or carry 25 pounds, occasionally lift and/or carry 50 pounds, stand and/or walk for about 6 hours in an 8 hour workday, sit for about 6 hours in an 8 hour workday and push and/or pull without limitation. (R. 183-86.) According to Dr. Puestow, the severity of the symptoms alleged by Plaintiff were disproportionate to the medically determinable impairments supported by objective medical findings. In support of his assessment, Dr. Puestow noted the "paucity of objective findings" as well as the exaggerated and non-organic signs observed by Dr. Reddy. (R. 182-89.)

On October 20, 2005, Plaintiff was seen by Dr. Edward L. Demmi for a consultative evaluation. (R. 224-28.) Plaintiff reported constant neck, mid and low back pain since March 2004, as well as numbness and tingling in her arms and legs bilaterally. Examination revealed restricted cervical flexion and extension, diffuse pain in the lumbar spine with limited thoracolumbar flexion, restricted range of motion in Plaintiff's left shoulder, and no swelling or crepitus in any of Plaintiff's joints. Neurological examination revealed no sensory or motor defects, a negative straight leg raise test on the right, and an equivocal straight leg test on the left. Dr. Demmi noted that Plaintiff repeatedly interfered with his examination by giving minimal to no effort during various clinical tests (e.g. heel-to-toe walking and active range of motion testing of her joints) allegedly due to her complaints of the required movements being "too painful." Dr. Demmi observed that Plaintiff "was able to ambulate, but very, very

slowly"—intermittently using a cane—with minimal to no antalgia. He further noted that "[t]here was no change in her gait with or without use of the cane." Mental status examination was unremarkable. Dr. Demmi's impression was cervical pain, low back pain with radiculopathy, and fibromyalgia. (R. 224-28.)

Dr. J. Vergo Attlesey, a non-examining state agency physician, reviewed Plaintiff's medical records in December 2005 and prepared a Physical Residual Functional Capacity Assessment. Dr. Attlesey found that Plaintiff could frequently lift and/or carry 25 pounds, occasionally lift and/or carry 50 pounds, stand and/or walk for about 6 hours in an 8 hour workday, sit for about 6 hours in an 8 hour workday and push and/or pull without limitation.  (R. 231-35.) In support of his opinion, Dr. Attlesey noted Plaintiff's "[e]xaggeration of symptoms and [Dr. Reddy's] non-organic findings," Plaintiff's poor participation at the independent medical consultation, and the lack of objective medical evidence to support Plaintiff's claimed severity of symptoms. (R. 230-38.)

According to progress notes from other examining physicians, Plaintiff reported to Dr. Jay Rubin for a neurological evaluation sometime between June and November 2004. Dr. Reddy noted in a progress note dated November 15, 2004, that Plaintiff's pain symptoms had been evaluated by Dr. Rubin and Dr. Rubin's examination of Plaintiff revealed no objective findings to explain Plaintiff's reported level of pain. (R. 152.) In September 2005 and January 2006, Plaintiff reported to Dr. Christina Thompson at the Veteran's Affairs Health Center for a check up and the treatment notes document that, at one point in time, Dr. Rubin was an "outside provider" of medical treatment to

Plaintiff. (R. 196, 203.) However, treatment notes from Dr. Rubin do not appear in the record before the Court.

In October 2006, Plaintiff reported to Dr. Lance Kim for a neurological evaluation regarding her persistent complaints of back, neck, and shoulder pain. (R. 314-15.) Dr. Kim noted that Plaintiff had diffuse pain syndrome "in virtually the entire body below the neck" with occasional numbness and tingling in her hands and feet accompanied by frequent cervicogenic headaches. (R. 314.) Examination revealed no gross ataxia, Plaintiff's cranial nerves and reflexes were intact, and Plaintiff's gait was unremarkable. (R. 314-15.) Dr. Kim observed "diffuse tenderness to palpation along the bilateral cervicobrachial and thoracolumbar paraspinal muscles and the proximal segments of all four extremities." (R. 315.) Dr. Kim also observed decreased sensation in Plaintiff's arms bilaterally. Based upon his examination and the results of an EMG and nerve conduction study, Dr. Kim diagnosed Plaintiff with post traumatic fibromyalgia, post traumatic cervicogenic headache, post traumatic cervical and lumbar sprain, and post traumatic depression. (R. 315.) Dr. Kim saw Plaintiff once more in February 2007 for a follow up consultation. Plaintiff advised that, since her previous visit, she began experiencing "unusual bilateral ptosis"[23] and occasional muscle weakness in her right leg. (R. 311.) Dr. Kim noted that the neurological examination was without change from Plaintiff's previous visit and diagnosed her with post traumatic fibromyalgia, post traumatic cervicogenic headache, post traumatic cervical and lumbar sprain, post traumatic depression, and bilateral ptosis with occasional leg weakness. (R. 311.)

---

[23] Ptosis is defined as "paralytic drooping of the upper eyelid." DORLAND'S MEDICAL DICTIONARY, *Ptosis* (2007).

Dr. Kim prepared two functional capacity assessment questionnaires on behalf of Plaintiff. (R. 302-10.) One of the functional assessment questionnaires was specific to fibromyalgia. (R. 302-07.) In the fibromyalgia-specific questionnaire, Dr. Kim limited Plaintiff to sitting for between 30 minutes and an hour; standing for between 10 minutes to less than an hour; never stooping or crouching; occasionally lifting less than ten pounds; and never lifting more than ten pounds. (R. 305-06.) Dr. Kim opined that Plaintiff had significant manipulative limitations including limited mobility in her left arm and the capacity to engage in only occasional reaching bilaterally. (R. 307.) He further opined that, over the course of a normal workday, Plaintiff would need to take between 4 to 5 unscheduled breaks of 30 to 40 minutes in duration. (R. 306.)

In the second questionnaire entitled, "Medical Opinion Re: Ability to Do Work-Related Activities (Physical)," Dr. Kim opined that Plaintiff was capable of lifting no more than ten pounds occasionally; sitting, standing and walking for less than two hours in an eight hour workday; never bending, twisting, crouching or climbing ladders; and climbing stairs occasionally with assistance. (R. 308-09.) According to Dr. Kim's assessment, Plaintiff also had manipulative, postural, and environmental limitations as a result of her impairments. For example, he opined that Plaintiff's impairments limit her ability to engage in reaching, gross manipulation, and pushing/pulling activities. Plaintiff should avoid all exposure to extreme cold, wetness, humidity, and hazards (machinery, heights, etc.) (R. 310.) With respect to postural limitations, Plaintiff would need to change position after five minutes of sitting and after 0 minutes of standing. Dr. Kim opined that Plaintiff would need to get up and walk around for approximately 5 minutes

every 10 minutes over the course of an eight hour workday. (R. 308-09.) Dr. Kim did not note any medical findings to support his assessments of Plaintiff even though he was prompted to do so in both questionnaires. (R. 302, 309-10.) One of the questions in the fibromyalga-specific questionnaire asks "Is your patient a malingerer?" to which Dr. Kim did not provide a response. (R. 303.)

### Migraine Headaches

Plaintiff has a long history of migraine headaches which pre-date the motor vehicle accident in March 2004. (R. 103-06.) For example, Plaintiff reported to her primary care physician in July 2001 for an annual check up with complaints of lightheadedness and headaches. Plaintiff advised that she had a history of diagnosed migraine headaches which had been treated in the past with medication. (R. 106.) In February 2003, Plaintiff reported to her primary care physician complaining of experiencing migraine headaches 4 to 5 times per week. (R. 105.) On March 17, 2004, a CT scan of Plaintiff's head revealed no acute abnormalities. (R. 130.) Plaintiff's applications for benefits focus on her neck, back, and shoulder complaints and only mention her headaches in passing. (R. 62-66.)

### Depression

Plaintiff was first diagnosed with depression during her initial office visit with Dr. Christina Thompson at the Veteran's Administration Health Services Center in September 2005. (R. 206.) During the examination, Plaintiff advised that she had previously been prescribed Cymbalta but had discontinued taking it. Dr. Thompson noted that Plaintiff had a good appetite, no insomnia, no headaches, she "doesn't feel

unhappy, depressed or anxious. No crying spells," and Plaintiff denied having any suicidal ideations. (R. 203-04.) Neurological examination revealed Plaintiff's cranial nerves were intact, no sensory, motor or reflex deficits, and a normal (but slow) gait. (R. 204.) The mental status examination was unremarkable and revealed that she was alert and oriented to time, place, and person, with intact judgment, insight, and memory. Dr. Thompson further noted "[n]o mood disorder [and] appropriate affect." (R. 206.) Notwithstanding Plaintiff's unremarkable mental status and neurological exams, Dr. Thompson diagnosed Plaintiff with depression and prescribed an anti-depressant. (R. 206-07.)

Plaintiff presented for an initial psychological assessment in August 2006 and was interviewed by Catovia Rayner, MSW, a social worker at the Veteran's Administration Health Services Center. (279-86.) Plaintiff denied having a history of psychological illnesses but reported having anxiety related to her motor vehicle accident in 2004. (R. 280-81.) She denied having any suicidal ideations or attempts. (R. 281.) Mental status examination revealed that Plaintiff was alert and oriented, had slowed psychomotor movements, good eye contact, her memory, judgment and insight were intact, and there was no evidence of thought process or content abnormalities. (R. 283-85.) Plaintiff demonstrated a sad mood with a depressed, irritable, and agitated affect. (R. 284.) The social worker noted that Plaintiff tended to display "some level of somatizing behavior"[24] and rated Plaintiff's global assessment of functioning ("GAF")

---

[24] Somatization is defined as "[t]he process by which psychological needs are expressed in physical symptoms." STEDMAN'S MEDICAL DICTIONARY 1788 (28th ed. 2006).

score to be 60.[25] Plaintiff returned for a follow up assessment one month later complaining of depressed mood, a diminished interest in almost all activities, sleep disturbances, feelings of worthlessness, and difficulty concentrating. The social worker rated her GAF to be 67 and referred her for a medical evaluation. (R. 267-68.) Plaintiff was subsequently examined by Valerie Messina, ARNP, a nurse at the Veteran's Administration Health Services Center who opined that Plaintiff's anxiety and depression were possibly related to post traumatic stress disorder issues secondary to a motor vehicle accident in March 2004. Plaintiff advised that, up until recently, she had not been taking her prescribed medications on a regular basis to control her mood and pain. Plaintiff reported that she had taken Cymbalta in the past and it helped her symptoms. (R. 269.) Mental status examination revealed that Plaintiff was alert and oriented with normal mood but sad and anxious affect. During the examination, Plaintiff made poor eye contact. Her speech was coherent and her thoughts were logical and organized. The nurse noted that Plaintiff's behavior was appropriate except for occasional inappropriate laughter which she attributed to probable anxiety. Plaintiff's GAF was rated to be 60. (R. 269-70.) Plaintiff was referred to the mental health counseling program through the Veteran's Administration; however, she was frequently a "no show" to her mental health counseling appointments. (R. 194, 201, 261, 262, 279.)

---

[25] (R. 285-86.) A person whose GAF score falls between **51 and 60** is described as having "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32, 34 (4th ed. 2000).

Other than the psychological assessments conducted through the Veteran's Administration, Plaintiff's medical records offer little information concerning her mental health. Several progress notes note her diagnosis of depression and that she is taking anti-depressants. (R. 191-93, 195-97, 200, 206, 259, 261, 263-64, 267, 269-71, 273, 279, 285, 303, 311, 314-15.) Most mental status examinations of Plaintiff were unremarkable – Plaintiff was alert and oriented with appropriate mood and affect. (R. 196-97, 204, 206, 227, 260, 273.) According to multiple treatment notes, anti-depressants apparently helped improve Plaintiff's mood and sleep disturbance symptoms. (R. 263-64, 269, 279.)

**B.** ***Plaintiff's Testimony***

During the hearing on April 12, 2007, Plaintiff testified that, as a result of her medical problems, she is unable to work because she has difficulty "getting up and sitting down, changing of position, walking, lifting, [and] bending." (R. 345.) According to Plaintiff, her biggest problem is her back pain. (R. 339.) She attributed her back pain to problems with two or three discs in her spine. (R. 337-38.) She described experiencing low back pain on a daily basis and muscle spasms in her back muscles "practically every other day." (R. 339-40.) She also described weakness and numbness in her legs which occasionally caused her legs to "go out from underneath" her. (R. 338.)

In addition to her back pain, Plaintiff testified that she also experiences pain in her left shoulder which limits her ability to lift her arm above shoulder height as well as pain and a limited range of motion in her neck due to a disc bulge. (R. 337.) As a result of all of her pain symptoms, Plaintiff has difficulty sleeping. (R. 344-45.)

Plaintiff also testified that she suffers from depression and anxiety. Due to her mental health problems, Plaintiff testified that she gets nervous while driving and she cries a lot. (R. 344-45.)

Since February 2007, Plaintiff testified that she has been reporting to Dr. Ramahan for treatment. She sees him approximately once every couple of months. Plaintiff also receives treatment at the Veteran's Administration Medical Center for pain management and mental health care. (R. 344.)

Plaintiff testified that she takes medication for relief of pain and fibromyalgia. (R. 338-39.) The medication was prescribed by her treating neurologist, Dr. Kim. (R. 338.) She also takes medication for depression and anxiety as prescribed by physicians at the Veteran's Administration Medical Center. (R. 344.) Plaintiff reported that she experiences "some" side effects from her medications – but none that she would describe as a "severe" problem. (R. 339.)

Plaintiff testified that she was capable of lifting 5 to 10 pounds with her right arm and 2 to 3 pounds with her left arm. Plaintiff estimated that she would be able to stand for about a minute at a time, and sit for about fifteen minutes before she would have to stand up or change position. (R. 343-44.) After fifteen minutes, her left leg goes numb. (R. 344.) She was unable to estimate how long she could walk before she would have to stop. (R. 343.) Plaintiff walks with a cane that was prescribed by her physical therapist and she testified that she can walk without an assistive device on some days with difficulty. (R. 340.) However, she uses the cane to help her stay upright. The cane also helps her to lift her legs, particularly when going up stairs. (R. 340.)

Plaintiff is unable to cook or clean. She testified that, on some days, she is capable of driving to doctor's appointments and to church. (R. 341.) Prior to her motor vehicle accident in 2004, Plaintiff worked for the Department of Labor One Stop from 2000 to 2004 as a case manager. (R. 341-42.) Prior to that, Plaintiff worked as an office manager. According to Plaintiff, she is capable of doing office type work when she is having "an excellent day" but not on one of her "normal" days. (R. 342.) Plaintiff testified that she attempted to do volunteer work at her church, but it did not "go very well." (R. 340-41.) She still occasionally does data entry work at her church. (R. 346.) However, after a couple of hours, her hands swell and she experiences pain in both arms. (R. 346.)

## C.    *The ALJ's Findings*

In the ALJ's review of the record, including Plaintiff's testimony, and medical records from several health care providers, the ALJ determined that Plaintiff suffered from myofascial pain syndrome. (R. 14.) However, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations. (R. 16.)

The ALJ then found that Plaintiff retained the RFC to perform the full range of medium work. The ALJ limited Plaintiff to lifting and/or carrying up to 25 pounds on a frequent basis and up to 50 pounds on an occasional basis; to standing and/or walking for a total of up to six hours per eight hour workday; and to sitting (with normal breaks) for a total of up to six hours per eight hour workday. (R. 16.) As for mental impairments,

the ALJ found that Plaintiff did not suffer from a severe mental impairment and that she has only mild restriction of activities of daily living; mild difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation. (R. 16.) After finding that Plaintiff could perform her past relevant work as an office manager or case manager, the ALJ concluded that Plaintiff was not disabled. (R. 18.)

## IV. <u>DISCUSSION</u>

Plaintiff raises two issues in her appeal. First, Plaintiff argues that the ALJ committed legal error by failing to set out in his findings, or the body of his decision, Plaintiff's step two severe impairments thereby precluding the Court's review of whether the ALJ considered Plaintiff's impairments in combination. Second, Plaintiff contends that the ALJ erred by failing to articulate adequate reasons for rejecting the opinions of treating physicians Dr. Prathim Reddy and Dr. Lance Kim concerning the functional limitations associated with Plaintiff's impairments.

In response to Plaintiff's first argument, the Commissioner correctly points out that, "the ALJ could not have committed any error at step two because he found that [Plaintiff] had a severe impairment . . . and moved on to the next step in the evaluation, which is all that is required at step two."[26] The ALJ concluded that Plaintiff's myofascial pain syndrome constituted a "severe" impairment at step two of the sequential analysis and proceeded to step three. (R. 14.) As such, while it may have been better had the ALJ made an explicit finding as to the severity of Plaintiff's migraine headaches for the

---

[26] (Doc. 18 p. 5) (quoting <u>Council v. Barnhart</u>, 127 Fed. Appx. 473, No. 04-13128, slip op. at 4 (11th Cir. Dec. 28, 2004) (table)); *accord* <u>Jamison v. Bowen</u>, 814 F.2d 585, 588 (11th Cir. 1987); *see also* <u>Maziarz v. Sec. of Health & Hum. Servs.</u>, 837 F.2d 240, 244 (6th Cir. 1987).

sake of clarity, because the ALJ found at least one impairment to be severe and proceeded to step three of the sequential analysis, the ALJ's analysis at step two does not constitute reversible error.[27]

To the extent that Plaintiff argues that the ALJ's decision does not make it clear whether the ALJ considered Plaintiff's impairments in combination in making his disability determination, the Court finds that the ALJ's written decision properly addressed Plaintiff's impairments in accord with Eleventh Circuit law.

Where a claimant alleges more than one impairment, the Commissioner has a duty to consider the cumulative effects of the impairments in making the determination as to whether the claimant is disabled.[28] According to the Eleventh Circuit, this burden is met where the ALJ expressly states that he has considered all of the medical evidence and concludes that Plaintiff is not suffering from "an impairment, or a combination of impairments listed in Appendix 1, Subpart P."[29] Similarly, an ALJ's statement that "based upon [his] thorough consideration of all evidence, [he] conclude[d] that the [claimant was] not suffering from any impairment, or combination of impairments of sufficient severity to prevent him from engaging in any substantial gainful activity for a

---

[27] Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987).

[28] Jones v. Dep't of Health & Hum. Servs., 941 F.2d 1529, 1533 (11th Cir. 1991) (citing Hudson v. Heckler, 755 F.2d 781, 785 (11th Cir. 1985), *aff'd on other grounds*, Sullivan v. Hudson, 490 U.S. 877 (1989)).

[29] Id.

period of at least twelve continuous months" clearly evidences that the ALJ properly considered the claimant's impairments in combination.[30]

In this case, after summarizing the medical evidence concerning Plaintiff's various alleged impairments—including her "constant headaches" and depression—the ALJ concluded that Plaintiff's myofascial pain syndrome constituted a "severe" impairment at step two of the sequential analysis. (R. 14-16.) The ALJ then proceeded to step three of the sequential analysis and then concluded that, "[Plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." In his assessment of Plaintiff's RFC, the ALJ expressly noted that his assessment of Plaintiff's RFC was based upon his "consideration of the entire record" as well as "all symptoms and the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence." (R. 16.) Accordingly, consistent with Eleventh Circuit precedent, these statements by the ALJ are more than sufficient to demonstrate that he properly considered Plaintiff's impairments in combination.[31]

With respect to Plaintiff's second issue, the Commissioner argues that the ALJ properly considered the opinions of both Dr. Reddy and Dr. Kim and his decision to give

---

[30] Wheeler v. Heckler, 784 F.2d 1073, 1076 (11th Cir. 1986).

[31] See e.g., Nigro v. Astrue, No. 8:06-cv-2134-T-MAP, 2008 WL 360654, at *2 (M.D. Fla. Feb. 8, 2008).
Even if it might have been a better practice for the ALJ to make more explicit findings regarding the severity or non-severity of the Plaintiff's other impairments, the ALJ thoroughly discussed the evidence relating to all of the Plaintiff's impairments and took the combination of the Plaintiff's impairments into account in determining her residual functional capacity.

"very little weight" to Dr. Kim's opinion and "greater weight" to Dr. Reddy's opinion is supported by substantial evidence. The Court agrees.

In rejecting Dr. Kim's opinion, the ALJ stated, "the assessment by Dr. Kim was inconsistent with the weight of the medical evidence of record, including Dr. Kim's own objective findings on examination." (R. 18.)

A treating physician's opinion is entitled to controlling weight only when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."[32] Nonetheless, substantial or considerable weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless "good cause" is shown to the contrary.[33]   The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.[34]  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[35]

---

[32] 20 C.F.R. § 404.1527(d)(2).

[33] Crawford v. Comm'r of Soc. Sec., 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records."); see also Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991); Sabo v. Comm'r of Soc. Sec., 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[34] Edwards, 937 F.2d at 584 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

[35] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

Upon a review of the ALJ's decision, as well as an examination of the medical records at issue, the Court concludes that the ALJ properly considered the opinion of Dr. Kim and articulated good cause for discounting Dr. Kim's March 2007 assessment regarding Plaintiff's functional limitations.

As a starting point the ALJ correctly noted that despite Dr. Kim's conclusory opinion that Plaintiff had significant functional limitations, Dr. Kim's treatment notes from Plaintiff's two office visits—one in October 2006 and the other in February 2007—showed that Plaintiff was neurologically intact except for diffuse tenderness below the neck and diminished sensation in Plaintiff's arms and that Plaintiff's gait was normal. These conclusory opinions are in stark contrast to the largely benign clinical findings reported by Dr. Kim. Moreover, there is no discussion in Dr. Kim's treatment notes addressing any clinical findings which support his conclusory and severe opinions in Dr. Kim's March 2007 assessment regarding Plaintiff's functional limitations.[36]

Moreover, the ALJ correctly noted that Dr. Kim's opinion is inconsistent with the weight of the medical evidence of record, particularly with the progress notes of Plaintiff's treating orthopedist, Dr. Reddy. Dr. Reddy began treating Plaintiff just months after the onset of her symptoms and continued to treat her over the course of five office visits. During her treatment of Plaintiff, Dr. Reddy referred Plaintiff to multiple specialists and conducted several diagnostic tests in an attempt to determine the source of her claimed symptoms. Dr. Reddy also attempted to treat Plaintiff's symptoms by sending

---

[36] Dr. Kim limited Plaintiff to lifting no more than ten pounds occasionally; and sitting, standing or walking less than two hours in a normal workday. Dr. Kim opined that Plaintiff would need to change position after five minutes of sitting and after 0 minutes of standing. Dr. Kim also opined that Plaintiff would need to take frequent and extended breaks over the course of a normal workday.

her to a chiropractor and referring her for a "very active course of physical therapy." (R. 156-57.)

Dr. Reddy consistently concluded that Plaintiff's complaints were inconsistent with the symptoms typically associated with an organic disease and that Plaintiff's complaints were more likely psychologically based.[37] For example, Dr. Reddy observed that Plaintiff's complaint of numbness in her left leg was "not specific to any nerve or dermatomal distribution." (R. 155.) In nearly every office visit with Dr. Reddy, Dr. Reddy noted that Plaintiff demonstrated "exaggerated pain responses to even light palpation." Indeed, Dr. Reddy went so far as to observe that "there is a gross psychological component to [Plaintiff's] pain."

After extensive diagnostic testing and repeated clinical examinations did not reveal any organic source of Plaintiff's persistent symptoms, Dr. Reddy referred Plaintiff to Dr. Rubin, a neurologist, for evaluation who reportedly "also did not find any objective findings for the level of pain that [Plaintiff] is having." (R. 152.)

With respect to clinical findings, the other medical evidence reviewed by the ALJ further supports the ALJ's conclusion to discount Dr. Kim's opinions. Medical evidence from other physical examinations typically revealed diffuse and non-focal tenderness without swelling or deformity in any of Plaintiff's joints; normal reflexes and sensation; slow, but otherwise unremarkable gait; and intact motor strength in Plaintiff's upper and lower extremities. (R. 90, 97-99, 197, 204, 206, 225-27, 260, 273.) Additionally, the

---

[37] An organic disease is a disease caused or accompanied by structural changes in organs or tissues. DORLAND'S MEDICAL DICTIONARY, *Organic Disease* (2007).

records of examination disclose a negative response on the straight leg raise testing. (R. 90, 227.) Notably, examining physicians—other than Dr. Reddy—also observed hypersensitivity and exaggerated pain responses upon palpation of Plaintiff's spine. (R. 96, 165, 206.) All of this evidence is at odds with Dr. Kim's assessment that Plaintiff was only capable of substantially less than the full range of sedentary work.

In sum, while Dr. Kim's conclusory opinions in isolation may be supportive of Plaintiff's argument, the ALJ's decision to discount Dr. Kim's opinion was not reversible error because the ALJ's well articulated reasons for doing so was supported by substantial medical evidence including the treatment notes from Dr. Reddy, a treating physician whose opinions are also entitled to great weight.

Finally, in view of the fact that the ALJ actually relied upon Dr. Reddy's opinion in deciding to give less weight to Dr. Kim, Plaintiff's argument that the ALJ erred by rejecting Dr. Reddy's opinion makes no sense. Moreover, as further evidence that the ALJ did not reject the opinion of Dr. Reddy, the ALJ relied upon the opinions of the two non-examining state agency physicians because their assessments were "fully consistent with the weight of the objective medical evidence of record, *including the findings of Dr. Reddy.*" (R. 18) (emphasis added). Lastly, rather than rejecting Dr. Reddy's opinion, the ALJ stated that he gave "greater weight" to Dr. Reddy's opinion that, by the end of 2004, Plaintiff was at maximum medical improvement with a permanent impairment rating of 2%.

Accordingly, because the Plaintiff has failed to point to any specific findings made by Dr. Reddy, which were rejected by the ALJ, and in view of the fact that the ALJ

actually relied upon Dr. Reddy's findings to support his decision to give "little weight" to the opinions of Dr. Kim, there is simply no basis for Plaintiff's argument.

## V. CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter final judgment in favor of Plaintiff consistent with this Order and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on February 23, 2009.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel